**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**SESHADRI RAJU, M.D., P.A.**                                                    **PLAINTIFF**

**V.**                                                    **CAUSE NO. 3:17-CV-357-CWR-LGI**

**MEDTRONIC, INC.**                                                    **DEFENDANT**

<u>**ORDER**</u>

Before the Court is a series of motions: Defendant's Motion to Strike Brian Brown's Second Report [Docket No. 278]; Defendant's Motion to Strike Brian Brown's Third Report [Docket No. 333]; Plaintiff's Motion to Strike Defendant expert, Dr. Paul Gagne [Docket No. 295]; Defendant's Motion for Partial Summary Judgment [Docket No. 301]; Plaintiff's Motion for Leave to File a Surrebuttal [Docket No. 339]. After due consideration of the motions, the responses, and the exhibits attached, the Court is prepared to rule.

**I.        Background and Procedural History**

What started out as a lawsuit about a failed business relationship between two doctors, in which Dr. Seshadri Raju accused the other, Dr. Erin Murphy, of breach of an employment agreement, fraud, embezzlement, among other things, *see Raju v. Murphy*, 709 F. App'x 318 (5th Cir. Jan. 26, 2018), has transformed into a brawl between Raju and Medtronic Inc., an international medical device company. The case has taken an arduous path. Raju initially sued Murphy in Hinds County Circuit Court. Murphy removed the action to this Court and filed her own counterclaims against Raju, which, in turn, made Raju second guess utilizing the courts to resolve his dispute. He had inserted arbitration language in the employment agreement, so he asked this Court to enforce that language and order the parties to arbitration. This Court refused to do so, concluding that Raju waived the right to arbitration by invoking the judicial process. Not happy with that decision, Raju

appealed to the Fifth Circuit, which affirmed and remanded the case to this Court. Discovery has concluded, So, here we are.

Raju is a vascular surgery specialist with over five decades of experience in medicine. In June 2014, he and Murphy entered into a Physician Employment Agreement in which the parties agreed that Raju would instruct Murphy in surgical techniques and procedures. The agreement included non-compete provisions and a confidentiality agreement.

During discovery into their contractual dispute, it was uncovered that Murphy, while still employed with Raju, began working for Medtronic. In October 2015, Medtronic hired Murphy to participate in its animal study of its ABRE stent in preparation for FDA approval. Medtronic then retained Murphy to be the National Principal Investigator for human clinical trials of the ABRE stent.

In February 2017, Murphy left Raju's employment on less than amicable circumstances. This action ensued. On March 2, 2019, Raju amended his Complaint adding Medtronic and accusing it of misappropriation of trade secrets, tortious interference with a contract, civil conspiracy, and copyright infringement. Docket No. 156. The gravamen of Raju's Complaint alleges that Medtronic misappropriated his trade secrets and copyrighted materials in order to create its own ABRE venous stent program.

The product at issue here is Medtronic's ABRE stent—a self-expanding stent system designed and intended "for use in the iliofemoral veins for the treatment of symptomatic venous outflow obstruction." Docket No. 250-1. In 2015, Medtronic acquired Coviden Inc., which had first developed a preliminary ABRE stent program in 2011. Docket 250-5, at 11. Dr. Jeff Vogel, Medtronic's Senior Principal Engineer for the ABRE, maintains that the ABRE venous stent

design was completed in 2015, although this fact is in dispute. *Id.* Since its FDA approval in 2020, the ABRE stent has been launched in both Europe and the United States.

Raju's Amended Complaint does not specify his trade secrets in detail; rather, it describes a range of broad "practices," "procedures," "designs," "techniques," "formulas," and "methods" used in venous stenting. Unsatisfied, Medtronic moved for a more definite statement seeking, *inter alia*, "a statement specifically identifying and describing with particularity the alleged trade secrets that Plaintiff claims were taken" and "a statement specifically identifying and describing with particularity each and every act of trade secret misappropriation that occurred on or after May 11, 2016, as required by the DTSA [Defend Trade Secrets Act]." Docket No. 165. After a hearing, the Court denied the motion but granted Medtronic leave to propound up to 20 expedited interrogatories to identify Raju's claims. Text Only Order of June 18, 2019. In answering Medtronic's interrogatories, Raju asserts Murphy disclosed the following trade secrets:

1. Stent placement procedure disclosed consists of the Plaintiff's flowering and expansion control procedure.
2. Stent deployment procedures consists of Plaintiff's sequence of configuring the upper and lower end of a stent and the deployment of a self expanding stent at predetermined landing sites.
3. "[T]reatment practices and programs" . . . consists of Raju's methods for choosing patients, the proper selection of patients, the monitoring and post op protocol of stent placement procedures.
4. "[V]enous stent surgery research compilations" . . . consists of Plaintiff's database of research and surgical procedures performed on over 3,000.00 patients.
5. "[S]tent devices" . . . consists of the joinder of two stents of different types or same type for use in the Iliac vein.
6. "[V]essel calculation formulas" . . . consists of Plaintiff's 1) Optimal size and length stent for Illiac vein use; and 2) Use of IVUS imaging and fluoroscopic imaging for vessel calculations.
7. "[V]enous stent designs" . . . consists of the physical properties of the stent such as radial strength, resistance, compressions etc, and configuration for specific use in the Illiac vein.
8. "[V]enous stent prototypes" . . . consists of Plaintiff's use of stents off label or application of new prototype.

Docket No. 250-6.

To describe the litigation as contentious is an understatement. The parties had a series of discovery disputes requiring multiple discovery conferences. Most pertinent here, issues arose over the utility of the ABRE's Design History File—a compilation of records that describes a device's design history. On September 13, 2019, Medtronic produced the Design History File in an image format. Raju complained that the document was completely unusable because it was in "an image format with no index and was not searchable." Docket No. 291.

In October 2019, Raju complained to the Court again and requested a PDF version of the file. The Court ordered Medtronic to produce the design history in PDF format by October 14, 2019. The remaining deadlines were extended as follows: Plaintiff's deadline to designate his experts was pushed to November 28, 2019, Defendant's deadline to designate its expert moved to January 6, 2020, and the general discovery deadline was extended to March 3, 2020. Docket No. 192. Raju then requested a searchable PDF version, which he received on October 29, 2019. Still, Raju claims that he had to spend substantial resources converting the documents into another format, optical character recognition, to properly review the Design History File.

Complying with the Court's Amended Scheduling Order, on November 27, 2019, Raju disclosed the expert report of Brian Brown. In that report, Brown summarized his conclusions of misappropriation of trade secrets in two broad categories: Venous Stenting Techniques & Flowering.[1] Docket No. 212-12.

On April 16, 2020 the Court extended the discovery deadline "until July 7, 2020 for the limited purpose of allowing discovery related to new information that Plaintiff did not know, or

---

[1] Brown described Raju's trade secrets as the following: "Venous Stenting Techniques . . . Dr. Raju developed and owned considerable trade secrets related to the design of the stent, its delivery into the vein, diagnostic methods like IVUS and the clinical expertise related to diseases requiring venous stents. . . . Unique techniques to treat venous occlusions through the use of clinical trials and patient data management." Docket No. 212-12 at 7. He describes the "Flowering" trade secrets as follows: "Dr. Raju has developed numerous proprietary techniques for the treatment of May Thurner Syndrome (MTS) and Post Thrombotic Syndrome (PTS). One such technique is called 'Flowering.'" *Id.* at 8.

could not reasonably have known, prior to February 9, 2020." Docket No. 260. That Order gave Raju until May 27, 2020, to submit supplemental expert reports, and Medtronic had until June 27, to do the same. *Id*. On May 27, 2020, Raju submitted Brown's supplemental expert report,[2] which identifies the trade secrets as follows:

> 1) Trade Secret No. 1: Proprietary use of intravascular ultrasound (IVUS) to precisely identify and quantify obstructive venous disease as well as the localization of optimal landing zones for clinical success.
> 2) Trade Secret No. 2: Proprietary stent position technique to reduce the incidence of contralateral deep vein thrombosis (DVT)
> 3) Trade Secret No. 3: Novel stent performance requirement to withstand 4mm diameter expansion beyond the rated caliber (diameter) of the stent.
> 4) Trade Secret No. 4: An algorithm establishing a unified process for patient selection and patient treatment.

Docket No. 268.

The discovery wars resumed. Among them, Raju claims that Medtronic produced over 170,000 additional documents after Brown submitted his initial report between January and May of 2020. Then, on June 6, 2020, Medtronic moved to strike Brown's supplemental report in its entirety contending that it is an improper *supplemental* report under Rule 26(e) of the Federal Rules of Civil Procedure. Docket No. 278. Raju countered that this report is in fact a proper supplemental report and is admissible under Rule 26(e). The following month, Medtronic filed its renewed motion for partial summary judgment. Docket No. 301. On August 31, 2020, Raju filed his response and supporting documents, including another report by Brian Brown, which was produced in the form of an affidavit. Docket No. 324-1.[3] On September 15, 2020, Medtronic moved to strike Brown's third report in its entirety under Rule 26(e). Docket No. 333. Again, Raju defends by arguing that Brown's third report is supplemental.

---

[2] In its briefing, Medtronic has labeled this as Brown's Second Report. The Court, however, will refer to is as the "supplemental report."

[3] This is actually Brown's second supplemental report, but, in their filings, the parties have labeled it the "third report." The Court will also refer to it as the third report.

The Court will first address the motions to strike because they affect, at least in part, the summary judgment analysis.

## II.    Medtronic's Motions to Strike

## A.    Brown's Supplemental Report

First, Medtronic argues that the Court should strike the supplemental report provided by Brown. It argues that Brown's reports exceed the limited additional discovery permitted by the Court's Extended Scheduling Order. Docket No. 278. Raju responds that Medtronic's motion should be denied because the report is permissible under Rule 26.

Rule 26 of the Federal Rules of Civil Procedure calls for "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). The purpose of this requirement is to avoid disclosure of "sketchy and vague" information. *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 571 (5th Cir. 1996). Rule 26 requires "a party [to] make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). The rule also permits the supplementation of an expert report when a party "learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). However, "supplements that include material additions to an opinion are not permitted." *Stubblefield v. Suzuki Motor Corp.*, No. 3:15-CV-18-HTW-LRA, 2018 WL 11008929, at *1, (S.D. Miss. Mar. 22, 2018), *aff'd on other grounds*, 826 F. App'x 309 (5th Cir. 2020) (citations omitted).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). To make that determination, courts are to consider: (1) the party's explanation, if any, for

its failure to disclose the information in a timely manner; (2) the prejudice to the opposing party if the evidence is admitted; (3) the possibility of curing such prejudice by granting a continuance; and (4) the importance of the evidence. *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996). After a thorough review, the Court concludes that Brown's supplemental report is not supplemental within the meaning of Rule 26(e). Brown's initial report identifies and briefly describes two trade secrets referred to as "Venous Stenting Techniques" and "Flowering." *See* Docket No. 212-12. However, Brown's supplemental report essentially abandons these theories and offers four separate trade secrets that are only tenuously related to Brown's initial report or Raju's Amended Complaint. *See* Docket No. 268.

The most glaring example of this change is Brown's "supplemental" opinion of Raju's Trade Secret #3. Without detailing any methodology, principles, or standards directly tied back to the initial report, Brown's supplemental report newly opines Raju's Trade Secret #3 as "novel stent requirement to withstand 4mm diameter expansion of the stent during reinterventions." Docket No. 268. A review of Brown's original report does not mention or discuss Raju's 4mm expansion technique. *See* Docket No. 212-12. This opinion in Brown's supplemental report plainly contravenes Rule 26's command to disclose a complete statement of all opinions that Brown will express and the basis and reasons for them. *See* Fed. R. Civ. P. 26(a)(2)(B).

Brown's supplemental report could and should have been offered by the Court's disclosure deadline since the information Brown relies on was produced well before November 28, 2019. "Courts have routinely rejected untimely 'supplemental' expert testimony where the opinions are based on information available prior to the missed deadline for service of initial disclosures." *Buxton v. Lil' Drug Store Prods. Inc.,* No. 2:02-CV-178, 2007 WL 2254492, at *5 (S. D. Miss. Aug. 1, 2007), *aff'd*, 294 F. App'x 92 (5th Cir. 2008).

Because Brown's challenged supplemental reports were not timely disclosed, the Court will determine whether they should be excluded under Rule 37. In doing so, the Court considers four factors: (1) the party's explanation for its failure to disclose evidence; (2) the prejudice, if any, to the party opposing the admission of the evidence; (3) the possibility of curing any prejudice with a continuance; and (4) the importance of the evidence. *Barrett*, 95 F.3d at 380.

Considering the first factor, Raju argues that "[b]y refusing to turn over tens of thousands of critical documents over six months," Medtronic's own discovery tactics necessitated Brown's supplemental reports. Docket No. 291 at 11. Even if that is true, it fails to explain why the supplemental report exceeds the scope of the Court's limited discovery designation[4] and the subject matter of the *initial report*. Receipt of new discovery materials can justify revising an analysis from the initial report or provide new details not previously known, but it cannot justify altering the description of a trade secret or abandoning a trade secret and replacing it with an entirely new one. "[S]upplemental report[s] that effectively replace[] an earlier report [are] not 'supplemental' within the meaning of Rule 26(a)." *United States ex rel. Gudur v. Deloitte Consulting LLP*, No. H–00–1169, 2007 WL 4322433, at *5 (S. D. Tex. Mar. 5, 2007) (citation omitted) (alterations added). Moreover, as one court has explained, "a party may not rely on supplementation as a way to remedy a deficient expert report or as a means of getting in, in effect, a brand new report." *Rojas v. Marko Zaninoich, Inc.*, No. 1:09-CV-705 AWI JLT, 2011 WL 4375297, at *6 (E.D. Cal. Sept. 19, 2011) (citation omitted).

As the Fifth Circuit stated, supplemental disclosures "are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Sierra Club*, 73 F.3d at 571. This is what Brown's supplemental report does. Raju presumably

---

[4] Plaintiff's amended its Complaint to add Medtronic and his trade secret claim on March 2, 2019. Discovery ended in this case a year later on March 3, 2020.

would not have brought this claim in the first place without reasonably certain expert information regarding the trade secrets allegedly appropriated by Medtronic. The Design History File and several other materials were available to Raju at the time of the initial report. We know they were because Brown cited them among the documents he relied upon in preparing his report. Thus, the Court concludes that the first factor weighs in favor of exclusion.

As to the second factor, Medtronic contends that it would be prejudiced by admitting Brown's supplemental report for two reasons: first, it will be forced to reengage its experts to rebut these new opinions and second, it will be forced to revise its pending summary judgment motion to address Brown's opinions. Raju responds that Medtronic had notice of Brown's opinions, and any possible prejudice can be cured under the current scheduling order.

"Disruption of the court's discovery schedule and the opponent's preparation constitutes sufficient prejudice to militate in favor of the exclusion of [expert] testimony." *Williams v. Gonzales*, No. CIV.A. 104CV342, 2005 WL 3447885, at *6 (E. D. Tex. 2005). It is undisputed that Medtronic and its experts have already filed extensive briefing on the nature of Raju's trade secrets and their appropriation. At this juncture, allowing Raju to put forward these varying opinions is inconsistent with the purpose of the discovery rules. As one court has explained, "[t]he purpose of exchanging expert reports is to let opposing counsel know about what the expert intends to testify, and to prevent the expert from changing his opinion as the litigation progresses." *In re Hanford Nuclear Reservation Litig.*, No. CY-91-3-15-AAM, 1998 WL 775340, at *197 n.364 (E.D. Wash. 1998), *rev'd on other grounds*, 292 F.3d 1124 (9th Cir. 2002). Thus, the second factor does not weigh in Raju's favor.

As to the third factor, while a continuance could afford Medtronic additional time to depose and respond to Brown about the information in his supplemental report, it would result in increased

cost and delay in an already costly and lengthy case. Because of the complexity of the issues in the case, the Court set generous deadlines on the front end to avoid the very type of delay that a continuance would cause. As such, this factor does not weigh in Raju's favor.

Lastly, the Court finds that late supplementation of Brown's report is important to Raju's case. Brown is Raju's only expert witness on his trade secrets claim. *See* Docket No. 212. Nevertheless, the significance of Brown's report only "underscores how critical it was" for the reports to have been timely disclosed. *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 883 (5th Cir. 2004). Thus, this factor only slightly weighs in Raju's favor. Medtronic's motion to strike Brown's second report is therefore granted.

**B.     Brown's Third Report**

Next, Medtronic moves to strike Brown's third report. Docket No. 333. The parties' arguments regarding this motion are identical to those concerning Brown's supplemental report. The Court has reviewed Brown's affidavit carefully and finds that Brown's third report departs from and expands upon his original report in numerous material respects. Again, the most glaring example of this change is Raju's Trade Secret #3. In Brown's third report, he opines for the first time that "I will testify that Murphy disclosed Raju's trade secret #3 of applying the Wallstent 4mm overexpansion technique to nitinol stents." Docket No. 324-1. A review of Brown's original report does not mention or discuss Raju's 4mm overexpansion technique, not to mention its application to "nitinol stents." It bears repeating:

> [T]he purpose of supplementation [under Rule 26] is to correct inadvertent errors, not to allow a party to engage in gamesmanship by creating a new and improved expert report in order to gain tactical advantage or by bolstering opinions to avert a dispositive motion or an expert challenge. *The duty to supplement does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report, and does not allow a party to file supplements intended to deepen or strengthen its own expert's prior Rule 26(a)(2)(B) report.*

*Munoz v. FCA US LLC*, No. CV 17-881 WJ/SCY, 2020 WL 7318076, at *4 (D.N.M. Dec. 11, 2020) (internal quotation marks and citations omitted) (emphasis added).

Applying the *Barrett* factors, for the reasons stated above, the Court finds that Brown's third report should also be stricken. Based on the foregoing reasons, Medtronic's motion to strike Brown's third report is granted.[5]

## II.   Raju's Motion to Strike: Dr. Paul Gagne

Turning to Raju's motion. Raju moves to strike Medtronic's expert, Dr. Paul Gagne, because he is the sole owner of Vascular Breakthroughs—a clinic that conducts site studies for the clinical trials of Medtronic's ABRE. Docket No. 295. This relationship, Raju argues, creates "a glaring and undeniable conflict of interest" because Gagne "has a monetary interest in the ABRE stent and an allegiance to Medtronic that far surpasses the role of a paid expert." Docket No. 296 at 3. Medtronic counters that Gagne has no "direct financial interest" in the outcome of the litigation, and any alleged bias is not grounds to exclude his expert testimony. Docket No. 308. To support their position, both parties rely heavily on *Perfect 10, Inc. v. Giganews, Inc.*, No. CV 11-07098-AB (SHX), 2014 WL 10894452 (C.D. Cal. Oct. 31, 2014).

Federal courts have the inherent authority to disqualify experts. *Koch Refining Co. v. Jennifer L. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996). "[D]isqualification is a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004). While cases that grant disqualification are uncommon, courts will employ this power to achieve important public policy

---

[5] That said, even considering the supplemental reports, the Court finds that summary judgment should be granted to Medtronic. *See infra*.

goals, including "preventing conflicts of interest and maintaining the integrity of the judicial process." *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1504 (D.Colo. 1993).

After careful consideration of the parties' arguments and the policy objectives at issue, the Court finds that the motion should be denied. Gagne does not have a direct financial interest in this case; he is compensated at an hourly rate of $500 and does not have an ownership interest in the ABRE. Docket No. 296-1. Raju has not cited, and the Court has not found, any case disqualifying an expert witness based on a similar indirect relationship. Thus, Raju's reliance on *Perfect10* is distinguishable, as it involved a sole shareholder with a direct financial stake in the outcome in the litigation. *See Perfect 10*, 2014 WL 10894452, at *1. Further, the *Perfect 10* court was skeptical that the conflicted shareholder "qualife[d] as an expert for the purposes of [the] litigation at all" as he "never testified as an expert witness in any litigation before, [and] has never published any books or peer-reviewed articles on any relevant topics at issue in this action." *Id.* In contrast, neither Gagne's qualifications nor the relevance of his opinions is at issue. While acknowledging its gatekeeping role, the Court will not usurp the jury's function of making credibility determinations and weighing the evidence. *See Madison Cnty. Nursing Home v. Broussard,* No. 3:17-CV-422-CWR-JCG, 2019 WL 3782191, at *3 (S.D. Miss. Aug. 12, 2019).

Raju has all the appropriate information at hand to make a promising impeachment and cross-examination, which will all play out before the jury. *See In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 792 (5th Cir. 2018). Raju's concerns about Gagne, go to the weight of the evidence, not its admissibility. Therefore, Raju's motion will be denied.

### III.   Motion for Summary Judgment

Medtronic seeks partial summary judgment on three grounds: 1) all of Raju's claims for trade secret misappropriation under the Defend Trade Secrets Act (DTSA) and the Mississippi Uniform Trade Secrets Act (MUTSA); 2) all of Raju's copyright infringement-related claims for statutory damages and attorneys' fees; and 3) all of Raju's civil conspiracy claims under state law.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inferences in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of that party." *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citation omitted). A fact is material if it is one that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute. Fed. R. Civ. P. 56(c)(1). That evidence may include "depositions, . . . affidavits or declarations, . . . or other materials." *Id.* When evaluating a motion for summary judgment, a court refrains from making credibility determinations and views the evidence in the light favorable to the non-movant. *Strong v. Dep't of Army*, 414 F. Supp. 2d 625, 628 (S.D. Miss. 2005).

### A.  Federal and State Trade Secrets Claims

The DTSA and the MUSTA provide a private cause of action for misappropriation of a trade secret. *See* 18 U.S.C. § 1836(b)(1); Miss. Code Ann. § 75-26-7. Generally speaking, the elements required to establish a claim for misappropriation are the same under both the DTSA and

the MUSTA.[6] To establish such a claim, a plaintiff must show: (1) the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means. *Compare Ultradent Prods. Inc. v. Spectrum Solutions LLC*, No. 2:17-CV-890, 2018 WL 324868, at *2 (D. Utah Jan. 8, 2018) (listing elements of misappropriation claim under the DTSA) and, *Blue Star Land Servs. LLC v. Coleman*, No. CIV-17-931-R, 2017 WL 6210901, at *4 (W.D. Okla. Dec. 8, 2017) (same) *with*, *Brown & Brown of Miss., LLC v. Baker*, No. 1:16-CV-327-LG-RHW, 2017 WL 5158667, at *3 (S.D. Miss. Nov. 7, 2017) (listing elements of misappropriation claim under the MUSTA).

The DTSA defines "trade secret" broadly. It includes "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as (1) the owner of the trade secret has taken "reasonable measures to keep such information secret" and (2) such information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by" another person. 18 U.S.C. § 1839(3). The MUTSA's definition of "trade secret" closely mirrors that of the DTSA. *See* Miss. Code Ann. § 75-26-3d (defining "trade secret" as information, "including a formula, pattern, compilation, program, device, method, technique or process" (1) that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and (2) that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy").

---

[6] Under the DTSA, a trade secret must also "relate[ ] to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

"A trade secret 'is one of the most elusive and difficult concepts in the law to define.'"
*Tewari De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C.*, 637 F.3d 604, 613 (5th Cir. 2011)
(quotations omitted). Under the DTSA, for the information to qualify as a "trade secret," the owner
must take "reasonable measures to keep such information secret," and the information must
"derive[] independent economic value . . . from not being generally known to, and not being readily
ascertainable through proper means." § 1839(3)(A)-(B). "The efforts required to maintain secrecy
are those reasonable under the circumstances, and courts do not require extreme and unduly
expensive procedures to be taken to protect trade secrets." *Ruby Slipper Cafe, LLC v. Belou*, No.
CV 18-1548, 2019 WL 1254897, at *6 (E.D. La. Mar. 19, 2019) (citations and internal quotation
marks omitted) (applying the DTSA and Louisiana Uniform Trade Secret Act).

Similarly, under Mississippi law, there are two prongs a plaintiff must establish to prove
the existence of a trade secret. First, the trade secret "must derive economic value, actual or
potential, from not being generally known to, and not being readily ascertainable by proper means
by other persons who can obtain economic value from its disclosure or use." *Marshall v. Gipson
Steel, Inc.*, 806 So.2d 266, 271 (Miss. 2002) (citations omitted). Second, the court must consider
whether the information was "subject to reasonable attempts to preserve its secrecy." *Id.* at 272;
*see also TLS Mgt. & Mkting, Serv., LLC., Mardis Finan. Serv., Inc*. 2018 WL 3698919, at *4 (S.D.
Miss. Aug. 3, 2018) (observing that in order to claim that information is a trade secret a party must
take reasonable efforts to maintain its secrecy).

Generally, the existence of a trade secret is a question of fact to be decided by the factfinder.
*See General Univ. Systems, Inc. v. Lee,* 379 F.3d 131, 150 (5th Cir. 2004) (applying Texas law).
Nevertheless, in some situations, whether information is a trade secret may be evident from the
record. *See, e.g*., *Pepper v. Int'l Gaming Sys., LLC*, 312 F. Supp. 2d 853, 862 (N.D. Miss. 2004)

(applying Mississippi law). That is the case here. The Court finds the undisputed facts show that Raju has not established each element of his claims for misappropriation under the DTSA and the MUTSA.

### 1. IVUS Imaging

First, Raju claims a trade secret in his proprietary use of Intravascular Ultrasound (IVUS) imaging. IVUS is a type of medical imaging that uses sound waves to produce images of the inside of blood vessels. Raju has failed to establish that this information qualifies as a trade secret.

It is axiomatic that a trade secret must be secret. *Cataphote Corp. v. Hudson*, 422 F.2d 1290, 1293 (5th Cir. 1970) ("The subject matter of a trade secret must be secret. An item or process of public or general knowledge in an industry cannot be appropriated by one as his own secret.") (applying Mississippi law); *see also Gilson v. Republic of Ireland*, 606 F. Supp. 38, 43 (D.D.C. 1984), *aff'd*, 787 F.2d 655 (D.C. Cir. 1986) ("It is elementary that the subject of a trade secret must be secret and, thus, it must not be part of the public knowledge or of general knowledge in the trade or business involved."). Here, however, it is not disputed that the use of IVUS imaging for venous stenting is widely used and publicly known throughout the medical field. Raju himself—a pioneer in venous vascular surgery—has published, instructed, and presented on this very topic. Several of these articles were published well before Murphy entered into the parties' Physician Employment Agreement. Moreover, as Raju conceded at his deposition, up to 15 percent of practicing vascular surgeons use IVUS imaging, a practice he claims to have popularized and is "catching on." Docket 250-3 at 42. Thus, Raju's claim under this theory lacks its most substantial element: secrecy. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something

there must have been secret and misappropriated. The plaintiff must show concrete secrets.")
(applying Illinois law).

Raju then presses that his alleged trade secrets are based not on previously published
materials but are grounded in "advances" not disclosed until his 2017 in the article, "*Optimal Sizing
of Iliac Vein Stents*." Docket No. 320 at 12. Raju goes on to argue that "Murphy disclosed these
IVUS area thresholds to Medtronic employees in preparation for a Medtronic sponsored
symposium prior to the 2017 Raju publication date." *Id.* This argument is unimpressive. This
theory or alleged misappropriated trade secret is not found in the Amended Complaint or in
Brown's original expert report. Rather, it was first introduced in Brown's third report, which, for
the reasons stated above, is stricken as untimely. However, even considering this argument, it fails
because as Medtronic's correctly points out, "[n]o where does Raju even identify the specific
'IVUS area thresholds' that he claims are his trade secrets, nor does he point to any record evidence
showing that Medtronic used any such thresholds." Docket No. 335 at 7.

### 2.  Stent Position

Raju's second purported trade secret concerns a stent position technique used to reduce the
incidence of contralateral deep vein thrombosis. Raju contends that "[t]rade secret #2 does not
hinge on where to place the stent; instead, this trade secret hinges on where **not** to place the stent
– to specifically avoid touching the contralateral wall." Docket No. 320 at 15 (emphasis in
original). Again, Raju has failed to establish that this information qualifies as a trade secret.

Raju has presented and written extensively on his stent position technique. He has
published over 100 articles specifically describing his venous stenting techniques, including a 2015
article that explicitly teaches to avoid the contralateral wall: "When applicable, the stent was

placed as accurately as possible at the iliac confluence to cover the obstruction, with special care not to cover the contralateral inflow." Docket No. 303-13 at 3,4.

Raju further admits that 30 to 40 other vascular surgeons have observed him perform stent deployment procedure and venous stenting techniques and were under no restrictions which prohibited them from using what they learned from Raju in their own practice. Docket No. 250-3, at 25. There is no evidence, for example, that the observers were required to execute non-disclosure agreements or some other document which suggested the procedure was a trade secret and should remain secret. *E.g.*, *TLS Mgt.*, 2018 WL 3698919, at *4. "One who voluntarily discloses information or who fails to take reasonable precautions to ensure its secrecy cannot properly claim that the information constitutes a trade secret." *Interox America v. PPG Industries, Inc.,* 736 F.2d 194, 202 (5th Cir. 1984).

Worse, Raju's own expert concedes that one of Raju's published articles offers instructions about avoiding covering the contralateral wall. Docket No. 324-1 at 7. Now for the first time in response to summary judgment, Raju argues that his "proprietary method allows the stent to cover a portion of the contralateral flow as long as the stent avoids touching the contralateral wall." Docket No. 320 at 14.[7] This argument is untenable. A claim or new factual theory "which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Sup'rs of La. State Univ.,* 429 F.3d 108, 113 (5th Cir. 2005); *see Green v. JP Morgan Chase Bank, N.A.*, 562 F. App'x 238, 240 (5th Cir. 2014) (affirming refusal to consider new factual theory). Despite all he says about this trade secret, it was not secret. Thus, the Court concludes that Raju has failed to establish the existence of a trade secret claim.

---

[7] This argument is first raised in Brown's third report which for the reasons stated above have been stricken.

### 3. Overexpansion of Stents

Raju describes trade secret #3 as the "Novel stent performance requirement to withstand 4mm diameter expansion beyond the rate caliber diameter of stent." Docket No. 268 at 5. Brown, in his supplemental report, claims that a study performed at Raju's clinic investigated whether modest overdilation of Wallstent by 2 to 4mm lead to, among other things, a larger flow channel and, as a result, better clinical outcomes. *Id.* at 5. Again, the Court finds that Raju has failed to establish the existence of a trade secret. From the outset, because the Court concludes Brown's subsequent reports should be stricken, Raju has failed to present an admissible expert opinion on this theory. Thus, as a matter of law, Raju's failure to present an expert precludes him from establishing whether this information is readily ascertainable by proper means by another person. *See* 18 U.S.C. § 1839(3); Miss. Code Ann. § 75-26-3(d)(i).

However, even considering the supplemental reports, the Court finds that summary judgment should be granted to Medtronic. It is undisputed, as Brown concedes that Raju fully and publicly disclosed the technique of overdilating of Wallstent in the *Journal of Vascular Surgery: Venous and Lymphatic Disorders* in January 2016 and at an Annual Meeting of the American Venous Forum the next month. Docket No. 268 at 6.

Brown asserts that Raju's prior disclosures never mentioned the overdilation of nithonel stents, but instead mentioned only the overdilating of Wallstent. This is a distinction without a difference, since Raju's purported trade secret concerns the overexpansion itself. However, even assuming that it is a material distinction, Raju has failed to produce any evidence in the record that he had a trade secret regarding the overdilation in nithol stents, nor is there evidence in the record that he disclosed such a trade secret relating to nitinol stents to Murphy. As a result, Raju has failed to establish that he has a trade secret claim under this theory.

### 4. Algorithm for Patient Selection and Treatment

Raju's fourth trade secret involves his algorithm establishing a unified process for patient selection and patient treatment. Again, the Court concludes that Raju's efforts to keep this information secret were sorely inadequate. At his deposition, Raju conceded that he has written and presented extensively about his patient selection methods and treatment. *See* Docket No. 250-3 at 87, 91.[8] Among these presentations included a seminar entitled "*Chronic Venous Obstruction - Indications for Venous Stenting - How to Select the Patients?*" *Id.* at 91. Raju goes on to describe the information given at these presentations as "public domain information." *Id.* To repeat, a trade secret that becomes public knowledge is no longer a trade secret. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1002 (1984).

Conveniently, Raju now argues that "while [he] continuously shares knowledge about stent deployment with other physicians, he has withheld his late 'breaking discoveries and thoughts' that provide a competitive advantage or have future commercial potential." Docket No. 320 at 19. Such "advances" Raju argues include galley proofs of an article entitled "*Endovascular Management of Chronic Total Occlusions of the Inferior Vena Cava and Iliac Veins, Southern Association of Vascular Surgery*" by Erin Murphy, M.D., Blake Johns, BS, Elliot Varney, BS, and Seshadri Raju, M.D. Raju contends that Murphy disclosed this article to Medtronic before its publication and without Raju's authorization. *Id.*

Raju, however, does not address or even attempt to identify how or what information in this forthcoming article constitutes a trade secret. Moreover, and more importantly, the very concept of a peer-reviewed article shared with publishers and various authors is diametrically

---

[8] Raju concedes to have made other presentations including: *"Treatment of Chronic IVC Occlusion with Stents: Which Patients, Which Stents, and Results?"* and an article authored by Raju titled "*Endovenous Treatment of Patients with Iliac-Caval Venous Obstruction.*" Docket No. 250-3 at 87, 91.

opposed to the very concept of a trade secret. If Raju had an alleged trade secret in this information, *he would not have slated it for publication.*

Raju also contends that trade secret #4 includes "iliocavel junction"; "the use of IVUS";[9] "proper access angles"; "modifications in procedures involving obese patients"; "the use of overdilation between 2mm to 4mm"; "the use of stiff guidewire to avoid a kink point"; "and the best methods to recover a partial deployment." *Id.* Raju's everything-but-the-kitchen-sink approach is unavailing because he does not even attempt to explain how these are trade secrets, much less explain how they are his trade secrets or how Medtronic misappropriated them.

For the foregoing reasons, the Court concludes that Medtronic's motion on these claims should be granted.

### B. Copyright Infringement Claim

Next, Medtronic seeks to dismiss Raju's claims for statutory damages and attorney's fees under the Copyright Act. Defendants argue that, as a matter of law, Raju is barred from recovering such awards because he failed to timely register copyrights under § 412 of the Copyright Act. There will be "no award of statutory damages or of attorney's fees" where the infringement "commenced after the first publication of the work and before the effective date of its registration unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412(2).

In this case, Raju filed his copyright registration application on September 26, 2018, well over three months after its first publication, July 1, 2014. Therefore, Raju is barred from statutory damages or attorney's fees. *See, e.g.*, *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 144 (5th Cir. 1992); *see also Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 700–01 (9th Cir. 2008)

---

[9] For the reasons stated above, the Court finds that this is not a trade secret.

("[Section] 412 bars an award of statutory damages for [continuing] post-registration infringements when the initial act of infringement occurred prior to the effective copyright registration date," if the copyright registration date is more than three months after the date of first publication). As such, Medtronic's motion for partial summary judgment on this claim is granted.

### C. Civil Conspiracy Claims

Lastly, Medtronic argues that it is entitled to summary judgment on Raju's civil conspiracy claim. Raju responds by saying that the circumstances surrounding Murphy's secret employment create a jury question as to whether information was shared between Murphy and Medtronic, and that a reasonable jury could conclude that the parties conspired to use Raju's confidential information to finalize the design of the ABRE.

 "Under Mississippi law, the elements of a civil conspiracy are: (1) an agreement between two or more persons, (2) to accomplish an unlawful purpose or a lawful purpose unlawfully, (3) an overt act in furtherance of the conspiracy, (4) and damages to the plaintiff as a proximate result." *Rex Distrib. Co., Inc. v. Anheuser-Busch, LLC*, 271 So. 3d 445, 455 (Miss. 2019) (quotation omitted) (citation omitted). "A civil conspiracy claim cannot stand alone but must be based on an underlying tort." *Aiken v. Rimkus Consulting Group, Inc.,* 333 F. App'x. 806, 812 (5th Cir.2009) (citations omitted) (construing Mississippi law).

In this case, Raju cannot maintain his civil conspiracy claim against Medtronic because his underlying tort claim fails. Raju's civil conspiracy claim is dependent on his trade secrets claim, which for the reasons stated above, cannot proceed. Thus, Medtronic is entitled to summary judgment on this claim. Raju's motion for leave to file a surrebuttal is denied as moot. Docket No. 339.

## IV.    Conclusion

For the reasons above, the Court orders as follows:

I.    Medtronic's Motions to Strike are Granted.

II.    Raju's Motion to Strike is Denied.

III.    Medtronic's Motion for Partial Summary Judgment is Granted.

IV.    Raju's Motion for Leave to File a Surrebuttal is Denied as moot.

The Court will schedule a pretrial conference to set a trial date and related deadlines on

the remaining claims.[10]

**SO ORDERED**, this the 31st day of March, 2021.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[10] As in every case before it, the Court reminds the parties that this case is still in their hands and they should explore compromise. In light of this Court's Special Order #13, addressing the Coronavirus Pandemic, *see Special Order # 13*, No. 3:40-mc-11, Docket No. 85 (S.D. Miss. Mar. 16, 2021), a trial date is not likely imminent.